Case No. 319-0083 RDC Case Creek Trails, LLC v. Mount Beeson Development Airport Properties, LLC Accounts by John Belz v. Metropolitan Airport Authority of Rock Island County, Illinois Appellee by Robert Park May it please the Court, Counsel. This case is a contract case. Very basic background is that my client, so by the way, I'm John Doak and I represent the plaintiff appellant's RDC Case Creek Trails, LLC and Rock Island Development Airport Properties, LLC. This case is a basic contract case issue. Our allegation is that the defendant, Metropolitan Airport Authority, breached an express written warranty of their ability to lease the properties at the time the contract was entered into. We didn't know that. It took a lot of time to figure that out through the various iterations of the contract. This contract was entered into in 2010. It was terminated in March of 2012 when all of these issues were coming to a head. We filed suit and as you can see from the various motions and whatnot, there were multiple pleading issues before finally there were dueling motions for summary judgment. As a result of the dueling motions for summary judgment, this is a Danover Review case, strictly a matter of law on this very narrow issue. And that issue is whether or not once this contract was terminated by the airport, if my client's RDC had an obligation or a legal duty to send a notice of right to cure, provide time to cure before filing suit. And we're going to get into later on whether or not a notice would even be appropriate because of the issue of whether it's a notice that would eventually lead to a termination or a right to sue. But that's a different issue that I'll get into just a little bit. It is our belief and opinion that this is really ultimately a first-year contract towards issue, that when a contract is terminated, all future obligations of that contract are discharged. There's no duty to send a notice of right to cure or take any other action other than to file suit for the breaches that have occurred. Now, we have cited to the court and to the trial court Hornbook Law, Corbin on Contracts, Section 68.9. It says the exercise of that reserve power to terminate the agreement operates only prospectively. It discharges both parties from their contractual duty to perform any other duties that are unperformed. We also cited 17B, Corpus Juris Secundum, Contract 609, and went through the history of that in the trial court level, that a partial termination of contract is not favored by the courts. When you terminate a contract, it's done. It's over. The party who elects to terminate that contract, in this case the airport, cannot thereafter assert the contract for some purposes and regard it as an end for others. That's the simple argument. It's so simple, there are no Illinois cases. I can suggest why. Part of it is because we believe it is a simple issue, but also courts have found other ways of explaining that issue. And those other ways to discuss those issues all reach the same decision, and I'm going to talk about those. I'm going to talk about futility. I'm using the Columbus Container case, some Illinois cases, as well as Illinois law on P&C v. Wilson and Carroll v. Couric, and the admissions in the briefs of the defendant and the athlete. Then I'm going to talk about the indirect way of getting there, from the hypergraphics case, that notice of the default and right to cure is a conditioned precedent to termination of a contract, not for filing suit, unless it's explicitly set forth in the contract. I'll also talk about the indirect provisions that each provision of contract must be given its meaning. Then I'll hopefully, if I have time, delve into repudiation. And finally, an analysis of the court, what I believe is trial court's artificial and erroneous distinction between procedural and substantive law. We believe that in that respect, the court focused on the wrong half of the Columbus Container decision. And with P&C v. Wilson, it's clear that a procedural issue, there is no distinction, and a procedural issue is something that is terminated when the contract is, and you don't need to take those actions any further. Let me jump right into the futility, because I think that's the easiest case to do under Illinois law. First, though, the Columbus Container, which was the Southern District of Indiana case from 2002, we've reiterated that the court previously got that decision right in previous motions, and referenced that second half decision in upholding our ability to go forward with the suit, and then changed the court's decision and did not focus on the second half, went only on the first half of that case, which did not apply to these issues. Just to brief on Columbus Container, Columbus Container is a software issue, and there are some issues back and forth with them. Columbus Container sent a termination notice, said this contract is over, it's terminated. Legality filed suit, claiming that there were things due and owing from before. The court in the first half of the case said, hey, Columbus Container, you really didn't terminate this thing right. You were required to do a notice to cure before you could do the termination, therefore the termination was ineffective. So you're out. You have no case. And that's what the trial court focused on instead of the second half. The second half was, like us, we had been terminated, and we then filed suit for the breach of the express warranty. In Columbus Container, the court said, hey, wait a minute. Had Columbus Container argued that legality didn't file a notice prior to filing the lawsuit, it would have been pointless. It didn't matter. Why? Because the contract had been terminated or repudiated. The notice would have been pointless because that other party had attempted to terminate, repudiated it, and it's undisputed that that's what they were trying to do. When you send a termination letter, you are absolutely, clearly, unequivocally saying this contract is dead. We also have on the futility issue PNC v. Wilson. And PNC v. Wilson is an Illinois case. It's a mortgage dispute. The interesting fact there was that Mr. Wilson and his wife filed bankruptcy. When they filed bankruptcy, they did not reaffirm that debt, and that debt was discharged. PNC filed a mortgage foreclosure, and Wilson ran in and said, hey, wait a minute. Under HUD rules, you can't end our contract. You can't proceed with a foreclosure because you didn't send a notice of a face-to-face meeting. And the court said, no. You abrogated that contract. You abrogated the provisions. This thing is over and done with when you terminated and did not get or you did not reaffirm the contract. And that is a procedural issue, a procedural issue of you didn't send a procedural letter regardless of what would have happened because it was futile. There was no point. The contract was over with. Carroll v. Curry, which has been cited throughout all of the stuff in the trial court below. We didn't cite it in our brief, but the defendant's appellees did, is an even more interesting case. That's an engagement ring case. And in the engagement ring context, the court has some really interesting things to say, which I think are very applicable to this case. It says, although the record reflects that the plaintiff made no pre-suit demand for the surrender of the engagement ring, the record clearly establishes that any such demand would have been unavailing. Why? Because from the time the defendant filed her response to the plaintiff's complaint, she continuously maintained that because the plaintiff breached his promise of fidelity and caused the breakup via engagement, she was entitled to retain the possession of the ring. It would be futile. No demand was necessary. How does that apply in this case? Well, we already have all of these other components, but in their brief at page 30, the airport says, had you given contractually required notice, their theory, that we were in breach of warranty, several things would have happened. Number one, the airport could have pointed out that the warranty must be read in conjunction with the rest of the agreement. In other words, you lose. We just needed to tell you why. Pretty harsh word, but that's the way they've defended the case all the way through, just like what was decided in Carroll v. Curry. But they didn't stop. They said, number two, we could have discussed the rights and obligations of the contract, including my client's obligation to prepare and submit something called a concurrent land use release package as required by the FAA. Again, they're saying, plaintiff, you're wrong. We have a defense. Again, it would have been useless. But they took a third step, and they said, hey, we could have discussed what efforts, not what the airport, what RDC planned to do to attempt to cure what RDC claimed was the airport's breach of warranty before you had spent a ton of money on those efforts. So once again, they're saying, buzz off. You're wrong. We're going to defend this. Nothing else would have happened. It would have been futile. And I think that those futility cases, we have Columbus Container, which is incredibly close to the facts, except it was dealing with software as opposed to a development project. We have P&C v. Wilson dealing with a procedural issue where the court said, no, futility exists when the contract's done. And Carroll v. Curry, where they talk about the very specific defenses, also demonstrate that, in retrospect, it would have been futile. And therefore, there is no need to continue on with that. So we believe that that, on the futility issue, and by the way, we only need to win on one issue, because we have to show whether the court erred as a matter of law. So if the court erred in saying, in the big picture, under the Hornbook law, that doesn't apply, and she was wrong, we win. If the court erred on futility, and we show, which I think we have, that it would have been futile to send such a notice, we win. It goes beyond that. We have the indirect approach, the hypergraphic press case from the Northern District of Illinois. Again, another Illinois case. This is an issue that was raised by the defendant in their brief, and to which we responded. And in that case, the court was very clear to say, hey, wait a minute. A notice of default is not a conditioned precedent to filing suit. That's why the judge threw us out. She said, a notice of default was a condition of precedent to filing suit. And hypergraphics in the Northern District of Illinois cited cases in the Seventh Circuit and throughout, said no, it is a conditioned precedent to terminating the contract. So you give the notice of the breach the right to cure, then you can terminate the contract. Then the contract's dead. Counsel, past two minutes. Thank you. So I would ask you, in doing this, to compare the actual language and see the terms of the contract and what it says with regard to the various issues. And clearly, the contract does not say notice of right to breach is something required to sue. It has a whole different section on other abilities to sue, which is under Section 13F, or Roman numeral 13F. I would also point out, they talk about every provision of the contract must have meaning. Section 13D, the last sentence, is very important. Any failure or delay by developer in asserting any rights or remedies or any other default or alleged default, et cetera, will not result in a waiver of those rights or remedies. Yet in their brief, they say just the same thing. You should have notified us earlier. You should have notified us way back when you first. We don't know when that was. No discoveries occurred on that. But they continue to hammer that you waived it and you should have filed a notice. The actual language of the contract say our failure to raise something is not a waiver or breach of rights and remedies. Just real briefly, because I know I'm running out of time, in repudiation cases, we have Kelly v. Orico, Illinois law. Repudiation, when a party repudiates a contract, non-repudiating party is excused. Termination is the clearest, most concrete form of repudiation. It is a clear manifestation of intent not to perform under the contract. And we believe that those repudiation cases do go a step further and cannot be said to be, well, that's a different area of the law that doesn't apply. It certainly is the dog wagging the tail on a termination case. With that, I'd ask the court to consider these issues and reverse the court's decision remanding this back to the state court for further proceedings on the notice issue, keeping in mind that it was a dual motion for summary judgment. Thank you. Mr. Gose. Mr. Park. May it please the court, counsel. In 2010, the airport, RDC, and the city of Moline entered into a development agreement. Certain provisions, particularly three, are particularly relevant to this case. Section 13 of the development agreement is titled Remedies Upon Default. Section 13B requires a developer, RDC, to give notice to the airport if, in RDC's judgment, the airport is in material default of this agreement. Well, let me just ask you, this was before, I mean, it was the airport authority that sent notice that they were terminating the contract, right? The airport sent a notice of default to RDC asking them to cure in August of 2011 and eventually terminated RDC as a developer in March of 2012. Okay. And so any notice of default by the developer after that date would have accomplished what purpose? Well, the contract was still in effect until March of 2012, so it wasn't terminated. They don't even claim it was terminated before March of 2012. They claim that during this time period, they were spending all this time and effort trying to cure the airport's default but had never given us a notice of default. So according to their complaint, they knew or they say that they formed a judgment that the airport was in default of its warranty but never gave us notice of that. Okay. But at some point before the plaintiff filed suit, the airport said we're refuting, we're terminating this contract, right? Correct, because they had never, under the contract, RDC had an obligation to obtain financing within 90 days of the effective date of the contract, which is in October of 2010. We waited 10 months, gave them notice, they still didn't get financing. We waited until March of 2012 and then terminated. Who in the world is going to loan money to somebody to build something on property they have no ownership, whether it be a fee interest or a leasehold interest? Well, it was a loan commitment. We weren't asking them to actually have the money, but this is what they agreed to, Your Honor. It may have been difficult or maybe even impossible, but that's what they agreed to. Section 4A of the contract says in part, the city and airport will have no obligation to perform any action otherwise required herein until the developer provides the city and airport with evidence of its equity financing and construction debt financing. In other words, they promised as a condition for the airport doing anything that they would get both temporary construction financing and permanent equity financing, and they didn't get any evidence of that at all. Well, can they allege that it's because they assume that we under this contract that the airport authority had the legal authority to lease the ground? They did, and we believe that their belief was incorrect. But once they formed the belief, the contract required them, once an RDC's judgment that the airport was in material default, then RDC had a duty to give the airport notice, send a formal letter saying, we believe you're in default. Instead, they say, we never sent the notice, but we did all this other stuff to try to cure your default. Well, isn't, I mean, at the end of the day, isn't that really more of an issue of damages? In other words, if you're taking the argument, well, they incurred all these costs after they knew or should have known that we couldn't perform, and so you can't let them recover those. But whether they suffered any damages as a result of entering into a contract, as they allege, with somebody who knew that they didn't have the legal authority to lease that ground, whether they can recover all their damages or not is an issue of some of these matters you take. I mean, if you want to read out the provisions of the contract that say they have to give us notice, I guess the court could do that. But the contract specifically says in section, in addition to the section I just read, that in section 12A, it says the non-defaulting party shall be entitled to take any action allowed by applicable law by virtue of the default, provided the non-defaulting party first gives the defaulting party written notice of default and an opportunity to cure. Well, except they claim they didn't file suit until after your client terminated the contract, at which point you can't terminate it. But would you agree, at least under contract law, you can't terminate a contract, impugn that contract, and then rely on contract provision as a defense? Absolutely not, Your Honor. I don't agree with their analysis at all. What the cases say, and they're not Illinois cases, but I'll accept that. The cases say that wholly executory obligations are not, you can't enforce something that hasn't occurred already. But once they form the opinion that the airport was in breach of the warranty, then they have the duty to give us notice. That happened before they were terminated in March because they were spending, according to their allegations, they were spending money and doing all these actions to try to cure the alleged breach and claim $1.8 million in damages that they incurred. That was before the contract was terminated. So they had a duty, once they believed that the airport was in breach, their duty to provide written notice of that default arose. And that duty arose before the termination. It didn't arise after the termination. And I think that's one of the things that Mr. Gilk has been trying to give the idea that we expected them to send us notice after the contract was terminated. The notice should have been sent once they formed a belief that the airport was in breach of its warranty of ability to lease its property. Had they done that, then the parties could have talked it over, tried to work something out, and would have avoided this lawsuit, I believe. Well, but at the same token, did your client step on it by sending that letter repudiating the contract before there was any suit or demand by the developer? Your Honor, there was never repudiation of the contract. There's a difference between termination and repudiation. And I think we've tried to make that point in our brief, but repudiation is basically a unilateral statement. We're not going to perform. In this case, we went through the steps. We did what we believed they should have done. That is, we gave them a notice. We said, you've got time now to cure this. They didn't cure it, and then we terminated the contract. And what did they need to do to cure it? They would have needed to obtain evidence of financing. And how in the world were they going to do that? That's what they contracted to do, Your Honor. If the answer is they could never have done that, that's fine, but then there never would be a lease either because the airport has no duty to lease. Because there's a condition precedent to any obligation by the airport, the developer has to provide evidence of financing. But didn't the airport and the city have to operate in good faith? They entered into this contract. They know that at some point, in order to get financing, they're going to have to show that they have the right to the property, whether it's through the lease, whether it's through a fee, simple. I mean, somehow they're going to have the right to do that. And only you, your client, has the right to say to the lending institution, yes, we have these agreements in place, and work with the FAA, work with the airport authority. Yes, we are either in a preliminary stage, giving a letter of assurance, or saying, here, this is what you need for the financing package. I mean, at some point, that becomes necessary for the financing. And once your clients understand that, don't they have an obligation under the good faith that's written into the contract to extend the hand and to get that done? Your Honor, I don't know, but the way I read the contract, it says that the city and airport will have no obligation to perform any action until the developer provides evidence of financing. So the idea that the airport is responsible for the... So that is sad. If they felt that we were in violation of that, Your Honor, then they should have sent us a notice saying you're in violation. They thought they were continuing to work in partnership, and then they get a termination letter. But they got a notice of default that was sent in August of 2011, and they were terminated in March of 2012. So they had a long time there. If they felt we were in default in some way, they could have sent us a notice of default, as was required by the contract. In order to develop the property, did they need a release from the FAA? As the development agreement sets forth, there were a lot of requirements to get FAA approval for every stage of the development, yes. Could they get the FAA to release, or did you have to do that? We cooperated with them in submitting a packet, a land release package. To whom? To the FAA. They've never claimed that we didn't cooperate with them or that we were in bad faith in somehow blocking them from getting a loan or blocking them from doing what they were required to do under the contract. So when you did the things that you did to cooperate with them to get the release, how much time passed between that and when you gave the notice? We had given the notice in August of 2011, and I'm not sure exactly when the land release package was submitted. I think it was early 2012, and they were terminated in March of 2012. So at the time you sent them the notice of default, that package had not been submitted? No, it had been submitted. It hadn't been ruled on by the FAA yet. So you knew there was a problem with them getting the financing? We knew that they had never done anything to indicate that they had financing or were going to get financing or any sort of commitment to financing. So that's why we sent them the notice. RBC has cited contract cases containing notice requirements for termination that are nothing at all like the notice requirements of the development agreement. In the development agreement, notice was a prerequisite to suit, to taking any action allowed by applicable law. And that's not the case in the cases that they cited, some of which were cited in the reply brief, so we haven't had a chance to respond to those. But those include Allen Block Corporation v. County Materials Corporation, Hypergraphics Press v. Cengage Learning, G&K Services v. Bill's Superfoods, and Ariens v. Woods Equipment. Let me see if I can, I want to make sure I understand your argument in the first place. So what I hear you saying is one of the problems is after the developer knew or should have known that this wasn't going to fly, they kept spending money trying to do something, trying to further it. Is that anywhere close to one of your arguments? So that's what they claim. Our argument is once they believed we were in breach of warranty, they had a duty to give us notice that they had that belief, and then we could have talked about it or whatever. Instead, they never performed what their primary obligation was to obtain financing, which they were supposed to do within 90 days. They weren't terminated until well over a year after the contract was in effect. Still had no evidence of financing, and so they had done nothing to perform, and they'd never given us a notice that they thought we were in default. We terminate them, and six months later, they sue us. Well, in one respect, you said you all were working together to try to get this approval? We were cooperating, yes. Okay, well, what did that cooperation entail? In other words, because you just said you had no idea they weren't getting financing, so what did that cooperation involve on the part of the airport authority? The airport authority had an aviation expert in Springfield, as did the RDC, and the two experts worked together in submitting this land-release package. I don't know. Other than that, I don't know exactly, but I don't... I mean, they've never claimed we did anything to stop them from getting the financing, or that we didn't cooperate with them, or whatever. In their complaint, that is their allegation. That despite having knowledge of financing that was available pending a completed lease agreement, refused to engage in any good-faith negotiations with the plaintiff for such a lease until financing was secured. The defendant also refused to engage the proper FAA personnel or follow the relevant FAA guidelines for leases. So they do know that. Well, if they thought that, then they had a duty to send us a notice saying, you're not doing A, B, and C. Well, I think when they got their notice that there wasn't going to be any more work, wasn't that the termination? And that's their notice. The default notice was sent in August of 2011. The termination notice wasn't until March of 2012. But the city had to actually do the termination notice by ordinance, which was December 19th of 2011. That's what the documents that I have indicate. So the city of Maureen... The city ratified the termination of RDC as a developer in March of 2012. The city attorney says, Dear Todd, as you know, the city issued a notice of default to RDC on December 19th, 2011. It gave you 30 days to cure the default. Then we extended that cure period to March 1st in hopes of this financing. So they did it not until December. And they're the ones that really had to act, correct? No. Under the terms of the agreement? Yes, under the terms, we had to act, and the city also had to affirm that termination before they could be terminated. Both the airport and the city had to agree, and that didn't occur until March of 2012. I don't doubt that the city attorney sent Mr. Rafeisen a notice saying, You haven't performed what you're supposed to do, and you ought to get on the stick and do it. But he never did. And that's why the agreement was terminated. We have an agreement where their first and foremost obligation was to obtain financing, which they never did. They never notified us of the alleged breach of warranty that they claimed that we had. And we dispute that, of course, as we set forth in our brief. We had a statutory right to lease our property. And yes, every step of development had to be approved by the FAA, but we still had the right to lease our property. I don't know where they get the idea that we didn't. But they certainly never advised us of that, and had they advised us of that, we could have discussed it with them and taken it from there. And that's what was pointed out in the... packet that's going to be sent to the developer under separate cover that might be useful to the developer in securing... It says, So, I mean, it appears that there had to have been some communication or some knowledge on behalf of the airport and the city that they were doing. I mean, you keep saying they did nothing, but that they were trying to do that. I'm sorry. They never obtained financing. I'm not saying they never did anything to try to obtain financing, but they never obtained it. And when we asked them, I think, I don't know if this was mentioned in the brief, but when we asked them in discovery what financing they had, they sent us a letter dated, I think, in April of 2012 after the termination that they got from some banker in Champaign that said, Well, think about it. But it certainly wasn't a financing commitment. And if they did off more than they could chew, if they agreed to get financing that they couldn't get, then it's really, I don't see how you can turn around and say that it's the airport's fault that the developer couldn't get financing, which they agreed to do as a condition precedent to anything being done by the airport. Well, and I'm not sure anybody's got to say that as to whose fault it is at the pleading stage. It seems to me the question is, looking at their complaint and whatever evidence was put forth to the court at summary judgment, is there an issue of fact as to who's at fault here, including summary judgment? What the trial judge said was, before we look to see if there was a breach, we have to look to see if there was a notice. And there was no notice of default, and therefore, they don't have the right to sue. And that's what the contract says, and that's what the trial court ruled. And I guess my problem is, but for that termination letter, I'd probably agree with the trial court. But the duty to give notice arose as soon as they believed the airport was in default. It didn't arise after the termination notice. It arose before they spent supposedly $1.8 million trying to supposedly cure this alleged default. Well, I'm thinking that that might be a fair to mitigate damages issue, not an issue as to whether they can proceed with their suit. It may have a lot to do with how much they can recover, but I'm just not sure it affects whether or not we proceed. We simply ask that this court enforce the contract the way that it was written. And we believe that the duty occurred before was not wholly executory, as in the cases that they're applying for. Thank you very much. Thank you, Mr. Clark. Mr. Doak, some rebuttal? Thank you. Mr. Doak, before you start, can I ask a question? Certainly. When did RBC know that they needed something to get financing that they did not get? They knew about the time of the first notice that they didn't have a lease. They had to have a lease in order to get financing. They could not get a lease because it was not just a matter of getting a concurrent land use. They had to get a release. The airport had to get a release from the FAA. The basic pattern of that is, I think there's an Exhibit L to the contract that has grant assurances. Some of the real estate that issued in this development was given to the airport through grants from the FAA. Those grants had conditions that you could not lease, sell, or encumber without getting a release from the FAA through a very complicated process. That process is similar to the concurrent land use. Concurrent land use and release package, it's the same form, but it does two different things. One thing it does is to say, hey, we're just making sure that all of the things the FAA requires with regard to heights and overflow and flight and zoning type issues are okay. The other thing it does is, well, if there's also a release needed, then you have to do all of these other things. So that's kind of that background of the issue. Just to briefly respond, it seems from Mr. Park's argument that he actually believes that there was an absolute duty under the contract for RDC to give notice of default as soon as they learned of any issues. And a written notice of default. But that's just simply not what the contract says. 13D, the very last sentence, allows us to decide whether or not we're going to do that or not. It does not operate as a waiver of such default if we don't give such a notice. In fact, they were working diligently all the way up until the time that the termination became official to try and get these things done, including getting from a preliminary release package to a final release package, which had been discussed and worked on by these experts with environmental stuff. You had to do economic analysis. You had to have all kinds of soil sampling done. This was a very, very expensive process. My client was not willing to say, I want to get out of this by doing a notice so that I can terminate a contract. Why would I do that? This is a great contract. I'm going to work with these people and try and get it done. And I come back to the original issue that I think Justice Schmidt had about how do you get financing when there's no – we didn't know. And in fact, we were induced into this contract by this warranty of the ability to lease. No clue that this was aeronautical property subject to a grant from the federal government. That entire L exhibit is inches thick, and it's all presumptions of, well, if you did this, then you have to do this. We don't know if those preconditions existed. There's no way of knowing that. Only the airport would know that. And I think you see in the exhibit five, or in the footnote, I'm sorry, footnote one of our reply brief, that the airport did know they had a problem. And they specifically conditioned this contract on FAA approval. And that's how they were going to cure that issue without telling us. And so when Mr. Clark said the very first thing was you had to get financing, no, not true. The contract says that the first and foremost obligation was that the airport was to seek FAA approval of the contract within 90 days. And they didn't do that. So we assumed there would be no problem because we never heard there was a problem with the FAA full speed ahead. So as I said before, Mr. Clark says that we had an absolute obligation to provide notice and during these 16 months, absolutely not. We did not. We only had that obligation to send a notice if we wanted to take the steps towards terminating. And this was a very lucrative, valuable contract. And my clients wanted to do everything they could in order to keep it going. Thank you. Unless you have any other questions. All right. Thank you, Mr. Doak. Thank you, Mr. Parks. Thank you also. This matter will be taken under advisement. Written disposition will be issued.